# FIFTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

————————————————

Case No. 5D2025-3210
LT Case No. 42-2024-DP-211

————————————————

GUARDIAN AD LITEM and
DEPARTMENT of CHILDREN and
FAMILIES,

     Appellants,

     v.

J.G., and L.L., PARENTS of O.S.L.
and L.E.L., MINOR CHILDREN,

     Appellee.

————————————————

On appeal from the Circuit Court for Marion County.
Stacy M. Youmans, Judge.

Sara Elizabeth Goldfarb, Statewide Director of Appeals, and Amanda Victoria Glass, Senior Attorney, Appellate Division, of Statewide Guardian ad Litem Office, Tallahassee, for Appellant, Statewide Guardian ad Litem.

Rachel Batten, of Children's Legal Services, Brooksville, for Appellant, Department of Children and Families.

Richard F. Joyce, Special Assistant Regional Counsel, of Office of Criminal Conflict and Civil Regional Counsel, Casselberry, for Appellee, L.L.

No Appearance for Appellee, J.G.

July 31, 2026

PER CURIAM.

The Guardian Ad Litem ("GAL") and the Department of Children and Families ("DCF") appeal the lower court's order denying DCF's Emergency Petition to Terminate the Parental Rights of J.G. ("Mother") and L.L. ("Father"), who are the parents of O.S.L. and L.E.L. (collectively the "Children"). We affirm that portion of the order that found both Children to be dependent as well as that portion of the order that found that Mother abandoned the Children. We reverse the order to the extent that it determined that Mother did not engage in egregious conduct and to the extent that it determined that Father did not abandon the Children or present harm due to incarceration because those findings are not supported by competent substantial evidence and are clearly erroneous.

Background Facts

The Children in this case are O.S.L., a girl born in 2014, and L.E.L., a boy born in 2017. Father and Mother have a history of substance abuse, primarily involving methamphetamines. Mother uses meth daily. For a period of time, Father used meth on a daily basis and admits that his brain is "fried" due to all the drugs he has taken. Father has been repeatedly arrested and convicted for a series of violent crimes. He admits that he was high on meth each time he was arrested.

Father was raised by his grandmother because his parents were repeatedly incarcerated. Father, Mother, and the Children lived with the grandmother—who paid most of the bills—for an extended period of time; however, when the grandmother learned of their extensive drug use, she made Father, Mother, and the Children leave. They moved to a homeless camp where they lived in some type of camper, and where Mother and Father continued using meth even when their children were present.

2

Father was arrested, most recently, after he admittedly beat up a police officer. While Father was in prison on that charge, Mother and the Children were living in that homeless camp. When Mother was being arrested on a drug charge, she decided to entrust the Children to a couple she had seen in the homeless camp. She did not know their last names, and had no contact information had she wished to reach out to them about the Children's welfare. In fact, Mother knew almost nothing about this couple. She hoped the couple would take care of her Children.

However, the couple was either unable or unwilling to take care of O.S.L. and L.E.L. After a short while, the couple handed the Children over to Mike.[1] Mike took the Children in and promptly set about repeatedly sexually molesting O.S.L. who was nine (9) years old at the time. Additionally, the Children were living in Mike's dirty home that smelled and had dog feces scattered about. The Children were described as being filthy and smelling bad, as though they hadn't bathed in days.

Following her arrest, Mother was released from jail and was living with a friend in an apartment about twenty (20) minutes from the homeless camp and Mike. Although the evidence showed that children were allowed to live in that apartment complex, Mother never made any effort to retrieve the Children from the couple or from Mike. Mother never took the initiative to check up on the Children. The only time she saw them during a period of several months was on Mothers' Day 2024, when Mike brought them over to see her.

This was not the first time Mother had literally abandoned these Children. Several years earlier, after a fight with Father, she left Florida, took both Children with her, and went to North Carolina for four (4) months. While at a park, she went off with some people who had alcohol, leaving the very young Children on

---

[1] It is not clear from the record whether that is actually the man's name, but that is what the parties called him. We refer to him by first name only given the allegations of sexual molestation lodged against him for which he was arrested; however, at the time of the adjudicatory hearing, Mike's charges were still pending.

their own. Some folks passing by the park found the Children wandering around, miles from where Mother had abandoned them. North Carolina authorities found Mother, intoxicated, and took the Children from her. Father drove up to North Carolina within a few weeks and retrieved the Children. While that abandonment is not grounds for terminating Mother's parental rights in this case, it is relevant information as to Father's knowledge of Mother's parenting history.

Father knew Mother was the only person watching over the Children while he was in prison. The last two (2) times he was in prison, which were 2019 to 2022 and 2022 to 2026, he intentionally stopped communicating with all family members, including the Children. He testified that it was his choice to cut off all contact with his Children, and he admitted that he did not think about how they might feel about it. He said cutting off all contact made it easier for him to do his time, which he agreed was being selfish like he always was.

Furthermore, during his last stint in prison, his actions landed him in solitary confinement twice. First, he beat up his cell mate. Second, he took a swing at a corrections officer. He was placed in solitary confinement and was to remain there until his release from prison sometime in 2026. He was transferred from prison to the local jail so that he could attend the adjudicatory hearing. While in jail, he got into a fight with other inmates and was placed in solitary confinement, this time at the local jail.

The testimony at trial confirmed all of the above, and the trial court acknowledged the evidence that had been presented. Father testified that he had no contact with his Children while in prison or jail until efforts were made by DCF in connection with the underlying termination of parental rights ("TPR") proceedings. He did not provide any financial support for the Children, nor did he write any letters to them while in prison or jail. He claimed that he had requested one of the case workers to provide him with paper, envelopes, and stamps so he could write to the Children; however, when he was placed in solitary confinement, he wasn't able to locate any of those items. Father also testified that he cannot read or write, so it was unclear how he would have corresponded by letter with the Children from his solitary

4

confinement even if he had received paper and related mailing materials. While in prison, despite knowing Mother's poor history of parenting, Father made no effort to determine who was taking care of the Children.

Father's arrests and sentences were for violent acts against family members and police. He was convicted of domestic battery as to Mother and aggravated battery of his brother. He was also arrested and imprisoned when he "beat up a cop" that was trying to trespass him from a private location. He never took any classes for anger management or sought out drug abuse counseling while incarcerated; he testified that he didn't think they were available. Despite his violent nature, repeated incarcerations, habitual untreated drug abuse, and intentional suspension of all contact with his Children, he testified that he thought that he deserved another chance to parent them.

The trial court found that he was not able to provide financially for the Children because he was incarcerated and that this situation also made it difficult for him to correspond with or parent them. The trial court treated it as though Father was an unfortunate victim of circumstances and decided that he was entitled to another chance to parent the Children. Thus, it denied the petition to terminate his parental rights and ordered DCF to make arrangements to attempt reunification of Father and the Children upon his release.

Analysis

In TPR cases, the standard of review is highly deferential to the trial court's findings of fact. *Dep't of Child. & Fams. v. D.E.*, 325 So. 3d 277, 279 (Fla. 5th DCA 2021). "We review findings of fact to determine if they are supported by competent, substantial evidence." *Id.* Reversal is warranted "where [a] denial is not supported by competent, substantial evidence and is not in the children's best interests." *Dep't of Child. & Fams. v. K.W.*, 277 So. 3d 708, 710 (Fla. 1st DCA 2019).

"An appellate court will review de novo whether the trial court's determinations are based on a proper interpretation of the law." *Dep't of Child. & Fams. v. D.E.*, 325 So. 3d at 279 (Fla. 5th

DCA 2021) (quoting *G.S. v. T.B.*, 985 So. 2d 978, 982 (Fla. 2008)). "However, an appellate court is not required to defer to the trial court where there is no theory or principle of law that would support the trial court's conclusions of law." *Id.* (quoting *Statewide Guardian Ad Litem Program v. A.A.*, 171 So. 3d 174, 177 (Fla. 5th DCA 2015)).

<u>Dependency of the Children & Mother's Abandonment</u>

The trial court's finding that DCF proved by clear and convincing evidence that the Children are dependent is uncontested. The trial court's ruling that pursuant to section 39.806(1)(b) Mother abandoned the Children is supported by competent, substantial evidence and a proper application of law to the facts. Those findings are affirmed without further comment.

<u>Mother's Egregious Conduct</u>

The trial court found that clear and convincing proof had not been offered to prove that Mother engaged in egregious conduct as to the Children and denied that aspect of the TPR petition. Section 39.806(1)(f) and subsection 2., Florida Statutes, provides for termination of parental rights if:

> The parent or parents engaged in egregious conduct or had the opportunity and capability to prevent and knowingly failed to prevent egregious conduct that threatens the life, safety, or physical, mental, or emotional health of the child or the child's sibling. Proof of a nexus between egregious conduct to a child and the potential harm to the child's sibling is not required.
>
> . . . .
>
> 2. As used in this subsection, the term "egregious conduct" means abuse, abandonment, neglect, or any other conduct that is deplorable, flagrant, or outrageous by a normal standard of conduct.

Mother's turning these young Children over to total strangers, failing to check on them, and making no effort to re-take custody

6

upon her release from incarceration resulted in the sexual molestation of her daughter, placement of both the Children in a filthy home, and hygienic neglect of both the Children. All the while, Mother lived nearby in a nice apartment and made no effort to serve as a parent. The trial court's conclusion that Mother simply made an "unwise decision," as she had no reason to suspect Mike was sexually molesting her daughter and that she had no reason to suspect the worst of those to whom she entrusted her Children, cannot be squared with the facts or law. What Mother did with those Children was one degree away from simply leaving them on the street and hoping for the best. That conduct fits squarely within section 39.806(1)(f), and was proved up by competent, substantial, and uncontradicted evidence. Accordingly, we reverse that ruling because it is clearly erroneous and lacking in evidentiary support.

## Father's Abandonment & Incarceration

Father's right to raise his Children is an important constitutional right. *See A.M. v. Dep't Child. & Fams.*, 223 So. 3d 312, 315 (Fla. 4th DCA 2017). "However, in termination proceedings, the parent's rights are not the only ones at stake; we must also consider the interests of the child in our analysis." *Id.* (citing *N.S.H. v. Fla. Dep't of Child. & Fam. Servs.*, 843 So. 2d 898, 902 (Fla. 2003)). These Children have a right to achieve stability in their lives with parents who will actually and properly take care of them. When the rights of the parent and children are conflicting, "the ultimate welfare of the child[ren] . . . must be controlling." *Padgett v. Dep't of HRS*, 577 So. 2d 565, 570 (Fla. 1991) (quoting *State ex rel. Sparks v. Reeves*, 97 So. 2d 18, 20 (Fla. 1957)).

Despite the uncontradicted evidence regarding Father's conduct in intentionally cutting off all communication with his Children, offering them no financial or emotional support, failing to check on them, and being repeatedly incarcerated, the trial court declined to terminate his parental rights. That ruling is not supported by competent, substantial evidence and is clearly erroneous. We reverse.

7

It was Father's drug abuse and violent conduct that landed him in prison. While incarcerated in the general population of the prison, Father refused to see or speak with his Children and made no effort to check on their welfare. Then, his additional violent conduct while incarcerated landed him in solitary confinement, twice in prison and once in jail, where he had no privileges and no ability to communicate. Father's complaints that he wasn't given appropriate assistance by DCF while he was in solitary confinement aren't much different than the child who seeks sympathy as an orphan after killing his parents.

DCF sought to terminate Father's parental rights for abandonment pursuant to section 39.806(1)(b) and due to his repeated, somewhat lengthy, incarcerations. "Abandonment" is statutorily defined to mean a situation in which the parent "while being able, has made no contribution to the child[ren]'s care and maintenance or failed to establish and maintain a substantial and positive relationship with the child[ren], or both." § 39.01(1), Fla. Stat. Establishing or maintaining a substantial and positive relationship with his Children, "includes, but is not limited to, frequent and regular contact with the child[ren] through frequent and regular visitation or frequent and regular communication to or with the child[ren], and the exercise of parental rights and responsibilities." *Padgett*, 577 So. 2d at 570. Father's intentional choice to cut off all contact with his Children while incarcerated is the antithesis of that statutory definition.

There is no doubt a requirement that Father had to have the "ability" to frequently and regularly engage as his Children's parent. The trial court pointed to Father's incarceration as limiting his "ability" to frequently and regularly engage with the kids. However, incarceration or repeated incarceration of a parent is a specific reason for finding "abandonment." *See* § 39.01(1), Fla. Stat. ("The incarceration, repeated incarceration, or extended incarceration of a parent, legal custodian, or caregiver responsible for a child's welfare may support a finding of abandonment."). Thus, the inability to parent because Father was incarcerated is itself a category of abandonment that will support termination of parental rights. The evidence of such abandonment was undisputed in this case.

8

Father was incarcerated at the time of the adjudicatory hearing. Section 39.806(1)(d)3. provides for termination of parental rights where "continuing the parental relationship with the incarcerated parent would be harmful to the child and, for this reason, that termination of the parental rights of the incarcerated parent is in the best interest of the child." One factor that the trial court is to consider, found in section 39.806(1)(d)3.c., is "[t]he nature of the parent's current and past provision for the child's development, cognitive, psychological, and physical needs." The evidence was undisputed that Father had made no provision at all for the Children's development or needs while in prison. The trial court was further mandated by section 39.806(1)(d)3.d. to consider "[t]he parent's history of criminal behavior, which may include the frequency of incarceration and the unavailability of the parent to the child due to incarceration." The evidence was undisputed regarding Father's repeated history of violent criminal behavior and his frequent incarcerations, which made him unavailable to serve as a parent for these Children. "[W]here the testimony on the pivotal issues of fact is not contradicted or impeached in any respect, and no conflicting evidence is introduced, these statements of fact can not be wholly disregarded or arbitrarily rejected." *Guardian ad Litem Program v. K.H.*, 276 So. 3d 897, 902 n.2 (Fla. 3d DCA 2019) (quoting *Duncanson v. Serv. First, Inc.*, 157 So. 2d 696, 699 (Fla. 3d DCA 1963)); *State v. Fernandez*, 526 So. 2d 192, 193 (Fla. 3d DCA 1988).

"Being a parent requires [performing the] parental obligations to care for the child, specifically to ensure the child's life, safety, well-being, and physical, mental, and emotional health." *S.M. v. Fla. Dep't of Child. & Fams.*, 202 So. 3d 769, 782 (Fla. 2016) (citation omitted). Father did not even attempt to meet any of those obligations during his recent incarcerations. His announced intentions, even if heart-felt, to now become a good father amount to being too little, too late. *See J.C. v. K.K.*, 64 So. 3d 157, 163 (Fla. 4th DCA 2011). Properly applying the law to the undisputed facts leads to the inescapable conclusion that Father abandoned his Children and that this parental relationship was harmful while he was incarcerated and would be harmful to the Children moving forward.

Accordingly, we reverse as to the trial court's rulings regarding Father.

Manifest Best Interest and Least Restrictive Means

The trial court did not make determinations of whether termination of Mother and Father's parental rights would be in the manifest best interest of the Children and the least restrictive means of safeguarding them. Of course, those are mandatory considerations that remain to be determined; thus, we remand with instructions for the trial court to consider those two matters in accordance with section 39.810, Florida Statutes, and *Statewide Guardian Ad Litem Program v. A.A.*, 171 So. 3d 171, 177 (Fla. 5th DCA 2015).

AFFIRMED, in part; REVERSED, in part; REMANDED for further proceedings.

MAKAR, EDWARDS, and MACIVER, JJ., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

10